# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Dale Brooks, Employee, Respondent,

v.

Benore Logistics Systems, Inc., Employer, and Great American Alliance Insurance Company, Carrier, Petitioners.

Appellate Case No. 2022-000271

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from the Workers' Compensation Commission

---

Opinion No. 28198
Heard November 15, 2023 – Filed April 10, 2024

---

## AFFIRMED AS MODIFIED

---

William Franklin Childers Jr., of Eller Tonnsen Bach Law Firm, of Greenville, for Petitioners.

Robert T. Usry, of Holland & Usry, PA, of Spartanburg, for Respondent.

Walter Hilton Barefoot, of McAngus Goudelock & Courie LLC, of Mount Pleasant, for Amicus Curiae the South Carolina Employers' Advocacy Association.

**JUSTICE KITTREDGE:** In this workers' compensation appeal, we are called on to determine the relevance of ergonomics evidence in a claim for a work-related repetitive trauma injury under section 42-1-172 of the South Carolina Code (2015). In the workplace environment, ergonomics is generally understood to mean improving workplace safety, productivity, and performance. As we will explain, in terms of a claim for a repetitive trauma injury, ergonomics evidence may have some relevance in determining whether a particular job is "repetitive," but it has no relevance (and is inadmissible) on the issue of causation.

Respondent Dale Brooks suffered what he believed to be a work-related repetitive trauma injury to his back. Brooks sought workers' compensation benefits, substantiating his claim through medical evidence and testimony. Brooks's employer ultimately declined to have its own doctors treat Brooks. Instead, the employer commissioned an ergonomics report that (1) examined the general physical risks to which Brooks may have been exposed at his job and (2) concluded Brooks's injury was statistically unlikely to have been caused by his work activities. While the single commissioner ruled in Brooks's favor, an appellate panel of the Workers' Compensation Commission (respectively, the appellate panel and the Commission) relied on the ergonomics report, reversed the single commissioner, and denied Brooks's claim. Specifically, the appellate panel concluded Brooks's job was not repetitive, and it was statistically unlikely that his back injury was caused by his work duties. As a result, the appellate panel determined Brooks did not suffer a repetitive trauma injury within the meaning of section 42-1-172. The court of appeals reversed, holding the appellate panel did not have the authority to determine whether Brooks's job was repetitive and that any reliance on the ergonomics report was impermissible.

We now affirm the court of appeals as modified. While the Commission does have the authority and responsibility in repetitive trauma injury cases to determine whether an employee's job is repetitive, the appellate panel's decision that Brooks's job was not repetitive is wholly unsupported by the substantial evidence in the record. Further, concerning the issue of causation, the court of appeals correctly determined any reliance on an ergonomics report in a work-related repetitive trauma injury case is flatly contrary to the rule of law and, therefore, constituted reversible error by the appellate panel. Individual cases must be decided by the facts of the case and applicable law, not statistical probabilities. Using statistical probabilities to determine if an individual worker sustained a work-related injury would

eviscerate the Grand Bargain.[1]  Accordingly, we affirm as modified the court of appeals' decision and remand this matter to the Commission for it to calculate the benefits to which Brooks is entitled.

## I.

At the time of his injury, Brooks was employed as a "switcher" truck operator by Petitioner Benore Logistics Systems, Inc.[2]  His job involved moving semitruck trailers and ocean freight containers (referred to by the parties as sea containers) to various points in a shipping yard at the BMW manufacturing plant in Greer, South Carolina.  As we detail further below, moving a semitruck trailer or sea container requires a switcher truck operator to perform a specific series of tasks.  Because Petitioner expects its switcher truck operators to move at least thirty semitruck trailers or sea containers per twelve-hour shift, its switcher truck operators must repeatedly perform the same series of tasks at least thirty times per shift, that is, every twenty-four minutes.  Brooks, however, was particularly efficient and generally switched forty-five to sixty trailers per shift, meaning he performed the same series of tasks approximately once every twelve to fifteen minutes for twelve hours straight.

In early January 2017, Brooks began regularly experiencing aches and tingling in

---

[1] The Grand Bargain refers to the premise underlying workers' compensation laws nationwide.  In short, under the Grand Bargain, employees give up their right to sue their employers in tort in exchange for guaranteed compensation for work-related injuries regardless of fault.  Likewise, employers give up their right to assert various defenses against their employees' work-related injuries—such as assumption of the risk and comparative negligence—in exchange for immunity from tort liability and the ability to aggregate and insure the risks associated with work-related injuries. *See generally* Emily A. Spieler, *(Re)Assessing the Grand Bargain: Compensation for Work Injuries in the United States, 1900–2017*, 69 Rutgers U. L. Rev. 891, 900–08 (2017) (setting forth the history of the Grand Bargain in great detail).  In terms of determining whether an injury was causally related to the course and scope of employment, reliance on statistical probabilities is anathema to the Grand Bargain.

[2] There are actually two petitioners here: Benore Logistics Systems, Inc. and its workers' compensation carrier, Great American Alliance Insurance Co.  Their interests are identical in every respect, so we will refer to them collectively as Petitioner.

his back and legs, the onset of which tended to occur toward the end of his shifts at work. At first, he "took some Advil and wrote it off." However, on his final day of work (January 17), he experienced a sharper pain in his back when he was climbing the stairs to the switcher truck's rear platform. Brooks did not report the injury that day because he came down with the flu that night and believed the pain was merely a flu-related body ache. Once he recovered from the flu and realized his back continued to hurt, he sent a text message to his supervisor, reporting he had been injured at work two days before.

Because of some paperwork problems regarding his employer-provided health insurance, Brooks could not immediately determine which doctors were in-network for Petitioner, so he went to an emergency room on January 20, 2017. The emergency room notes stated Brooks's injury onset was "gradual" and that Brooks was "constantly getting in and out of trucks" at work. A physical exam and an x-ray both revealed "findings most consistent with degenerative disc disease at L4-L5, L5-S1," specifically, decreased range of motion, tenderness, pain, and a "loss of height seen [in the x-ray] at the L4-L5[,] L5-S1 disc spaces." Upon discharge, the emergency room doctors recommended Brooks follow up with an orthopedist.

Subsequently, Brooks was seen by his employer's approved doctor, Dr. Wes Merriwether. Dr. Merriwether noted Brooks suffered from "preexisting numbness and tingling into the thighs bilaterally of unknown duration" prior to the sharp pain experienced on January 17. After diagnosing him with a "right S1 sprain, lumbar strain," Dr. Merriwether imposed several work-related restrictions on Brooks's activities, including (1) alternating sitting, standing, and walking as necessary to minimize the pain and tingling; (2) limiting repetitive stooping, bending, or squatting; and (3) limiting lifting or reaching overhead. Dr. Merriwether referred Brooks for physical therapy, noting, "Because of the restrictions, [Brooks] said his company is unable to accommodate any restrictions and he would be out of work, [so] we are going to go ahead and begin physical therapy for this and treat what is believed to be an acute *work-related* right lumbar strain with sciatica." (Emphasis added).

At Brooks's follow-up visit, Dr. Merriwether ordered an MRI, referring Brooks specifically "for the treatment of a *work-related injury*." (Emphasis added). Dr. Merriwether noted he "plan[ned] to see [Brooks] back [at his office] after the MRI." However, curiously, two minutes after Brooks left Dr. Merriwether's office that day—and despite the additional tests and treatment ordered by Petitioner's own doctor—Petitioner informed Dr. Merriwether that Brooks's workers' compensation

claim was being denied and ordered Dr. Merriwether to provide no further services to Brooks.  Therefore, Brooks never received the MRI or follow-up care ordered by Dr. Merriwether.

Brooks then sought treatment from a new doctor, Dr. Eric Loudermilk.  Dr. Loudermilk's notes state:

> [Brooks] presents today complaining of pain in his back and leg which has been present since around January 3, 2017.  He runs a switcher truck.  He apparently works as a driver and he climbs up and down some stairs approximately 150 times per day switching trucks.  He apparently does at a minimum of 30 trailers per shift.  This involves switching trucks in and out multiple times during the day, opening and closing doors, bending and stooping, and climbing ladders.  Around January 3, 2017, he developed burning pain in his legs.  Several days later, he developed severe pain in his lower back which radiated down his leg all the way to the calf and right foot.

Dr. Loudermilk referred Brooks for an MRI, which showed a disk protrusion at the L4-L5 vertebrae that was irritating the nerve root in Brooks's spinal column.  Dr. Loudermilk therefore diagnosed Brooks with "low back pain with right lower extremity radiculopathy secondary to an L4-L5 lumbar disk protrusion."  Brooks then filed his claim for workers' compensation.

In response, Petitioner hired ergonomics expert Glen Adams—who is not a medical doctor—to "determine the ergonomic risk factors to which Mr. Brooks may have been exposed while performing his job duties."  After a brief visit to the BMW shipping yard and observing the tasks of a switcher truck operator (not Brooks), Adams generated a report (the ergonomics report) regarding the general ergonomic risks to which a switcher truck operator could be exposed if he performed the job in a manner similar to the subject being observed.  Adams concluded that, overall, there were "no elevated risks for the development of low back musculoskeletal disorders while performing the tasks of switcher operator."

Brooks's attorney subsequently sent Dr. Loudermilk a questionnaire, including the following questions:

> Did the repetitive activities of [Brooks's] job, including but not limited to going up and down stairs, getting in and out of a truck, opening and closing doors, bending and stooping, and climbing ladders, most

probably cause low back pain with right leg radiculopathy?

Did the repeated work activities above cause an L4-L5 disc protrusion shown on [Brooks's] MRI of 6.27.17?

Did the work injuries from repeated motion listed in [the first question] cause severe low back pain radiating to his right leg with numbness, tingling, burning, and weakness?

Dr. Loudermilk answered "yes" to all three questions, indicating his answers were made to a reasonable degree of medical certainty. Dr. Loudermilk also specifically reviewed the ergonomics report and stated it did not change his opinion in any way regarding whether Brooks's injury was caused by the repetitive activities of his job.

At the hearing before the single commissioner, Brooks testified and presented Dr. Loudermilk's opinion along with other evidence regarding his injury. To rebut the medical opinion that Brooks suffered a work-related injury, Petitioner introduced into evidence the ergonomics report but chose not to depose Dr. Loudermilk so as to directly question him regarding the questionnaire or his causation finding.

Ultimately, the single commissioner found Brooks had suffered a compensable repetitive trauma injury under section 42-1-172 of the South Carolina Code and awarded him benefits. Specifically, the single commissioner found that Brooks's job required him to perform "repetitive acts," and further found Dr. Loudermilk's determination—that, to a reasonable degree of medical certainty, Brooks's injuries were caused by the repetitive tasks required of him by Petitioner—was "uncontroverted" and, being the "only . . . medical opinion in the record," "must be given great weight." The single commissioner's order concluded:

Based on a preponderance of the evidence before me in this case, I must conclude that the Claimant has suffered a compensable *repetitive trauma* injury to his low back affecting his right leg.

A. I find a direct causal relationship between *the repetitive acts* and the [injury].

B. This finding is based on the entire record.

(Emphasis added). The single commissioner explained the ergonomics report, "while instructive, d[id] not control," particularly given that Dr. Loudermilk indicated he had reviewed the report and that it did not alter his medical opinion.

Petitioner appealed to the appellate panel, and the appellate panel reversed. As an initial matter, the appellate panel interpreted section 42-1-172 in a slightly different manner than it had in the past. *See generally* S.C. Code Ann. § 42-1-172(B) ("An injury is not considered a compensable repetitive trauma injury unless a commissioner makes a specific finding of fact by a preponderance of the evidence of a causal connection that is established by medical evidence between the repetitive activities that occurred while the employee was engaged in the regular duties of his employment and the injury."). More specifically, the appellate panel read the statute to require a two-part analysis: "First, there must be medical evidence establishing a causal connection between the condition under which the work is performed and the injury. Additionally, there is an independent requirement that a Commissioner find by a preponderance of evidence that the claimant's specific job activities are repetitive."

The remainder of the appellate panel's order is both perplexing and troubling. First, for reasons we do not understand, the appellate panel concluded the single commissioner failed to make a factual finding that Brooks's job was repetitive. After concluding that the single commissioner did not find Brooks's job was repetitive, the appellate panel determined the job was *not* repetitive, relying on what the appellate panel deemed the "unbiased" ergonomics report. The appellate panel discounted Brooks's "self-serving statements" as to whether the job was repetitive, faulting him for "not present[ing] any expert ergonomic evidence" to that effect. The appellate panel likewise discounted Dr. Loudermilk's medical opinion, finding the opinion was "entitled to less weight" because Dr. Loudermilk relied on Brooks's same "self-serving statements" as to what activities his job entailed. The appellate panel concluded "neither medical nor ergonomics evidence supports a finding that [Brooks's] job activities as a 'Switcher' were repetitive as required under S.C. Code Ann. § 42-1-172(B)." Thus, the appellate panel held Brooks had failed to meet his burden of proving a repetitive trauma injury.[3]

Brooks appealed, and the court of appeals reversed, assigning three categories of error to the appellate panel's decision. *See Brooks v. Benore Logistics Sys., Inc.*, 437 S.C. 376, 879 S.E.2d 1 (Ct. App. 2022). First, the court of appeals explained the two-part test announced by the appellate panel was unfaithful to the plain language

---

[3] Although the appellate panel order clearly addresses the section 42-1-172 causation element, it was, and remains, Petitioner's position that the appellate panel reached only the issue of whether Brooks's job duties were repetitive.

of section 42-1-172 in that it set an "extra hurdle" for claimants that, in large part, was redundant to their burden to prove causation. More specifically, the court of appeals found the appellate panel's new, two-part analysis would first require claimants to offer medical testimony establishing to a reasonable degree of medical certainty that the repetitive nature of their jobs caused their injury. However, according to the court of appeals, the two-part analysis would additionally "force claimants to offer expert testimony that their job duties were repetitive"—despite already having submitted medical testimony that they (the claimants) suffered a *repetitive* trauma injury.

Second, the court of appeals took issue with the appellate panel's attack on Dr. Loudermilk's credibility. In particular, the court of appeals explained that Dr. Loudermilk did not rely only on Brooks's "self-serving statements" as to what his job entailed, but rather specifically examined the ergonomics report—which set forth Adams's observations of Brooks's normal duties—and noted the report did not change his medical opinion that the repetitive actions Brooks was required to perform caused his back injury.

Finally, and most importantly, the court of appeals noted that, in at least two respects, the appellate panel's reliance on a generalized ergonomics report was misplaced. Initially, as the court of appeals correctly explained, "Recovery under § 42-1-172 is not limited to work injuries that an ergonomics report deems statistically likely." Moreover, the court of appeals noted the ergonomics report—prepared by someone other than a medical doctor—was not competent evidence of causation under section 42-1-172, which requires causation to be established by "medical evidence." The court of appeals concluded that, therefore, "all of the competent evidence support[ed] Brooks'[s] claim," and he was "entitled to compensation as a matter of law." The court of appeals thus remanded to the Commission merely for calculation of the benefits to which Brooks was entitled.

We granted Petitioner a writ of certiorari to review the decision of the court of appeals.

## II.

Because this appeal presents both a question of law and a question of fact, our standard of review is necessarily bifurcated. *See, e.g.*, *Murphy v. Owens Corning*, 393 S.C. 77, 81–82, 710 S.E.2d 454, 456 (Ct. App. 2011). First, we must interpret section 42-1-172 to determine what exactly a claimant is required to prove to establish a repetitive trauma injury, which is a pure question of law. *See Brock v.*

*Town of Mount Pleasant*, 415 S.C. 625, 628, 785 S.E.2d 198, 200 (2016) ("The interpretation of a statute is a question of law.  This Court may interpret statutes . . . without any deference to the court below." (cleaned up)).

Next, we must evaluate whether the appellate panel correctly determined the facts, which is subject to the substantial evidence standard of review.  *Murphy*, 393 S.C. at 82, 710 S.E.2d at 456.  "Under the substantial evidence standard of review, [we] may not substitute [our] judgment for that of the [appellate panel] as to the weight of the evidence on questions of fact, but may reverse where the decision is affected by an error of law," *id.* at 81–82, 710 S.E.2d at 456, or "is clearly erroneous in view of the substantial evidence on the record as a whole," *Clemmons v. Lowe's Home Ctrs., Inc.-Harbison*, 420 S.C. 282, 287, 803 S.E.2d 268, 270 (2017).  "Substantial evidence is not a mere scintilla of evidence nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached or must have reached in order to justify its action." *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981) (cleaned up).

### III.

Petitioner argues the court of appeals improperly reversed the appellate panel's finding that section 42-1-172 requires a two-part analysis.  We agree.

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000).  So long as a statute's language is plain and unambiguous, and conveys a clear and definite meaning, the Court must give effect to that clearly expressed legislative intent and has no right to impose any other meaning. *Grier v. AMISUB of S.C., Inc.*, 397 S.C. 532, 535–36, 725 S.E.2d 693, 695 (2012); *Hodges*, 341 S.C. at 85, 533 S.E.2d at 581.

Section 42-1-172 of the South Carolina Code provides, in relevant part:

> (A) "Repetitive trauma injury" means an injury which is gradual in onset and caused by the cumulative effects of repetitive traumatic events.  Compensability of a repetitive trauma injury must be determined only under the provisions of this statute.
>
> (B) An injury is not considered a compensable repetitive trauma injury unless a commissioner makes a specific finding of fact by a

preponderance of the evidence of a causal connection that is established by medical evidence between the repetitive activities that occurred while the employee was engaged in the regular duties of his employment and the injury.

(C) As used in this section, "medical evidence" means expert opinion or testimony stated to a reasonable degree of medical certainty, documents, records, or other material that is offered by a licensed and qualified medical physician.

(D) A "repetitive trauma injury" is considered to arise out of employment only if it is established by medical evidence that there is a direct causal relationship between the condition under which the work is performed and the injury.

S.C. Code Ann. § 42-1-172(A)–(D).

It is self-evident that, to receive compensation for a *repetitive* trauma injury, a claimant must first prove his or her job is in fact *repetitive*. Thus, we find the plain language of section 42-1-172 requires claimants to show, and the Commission to find, that (1) the nature of the claimant's work is repetitive; and (2) as a result of that repetitive employment, and as established by a preponderance of the evidence, there is a causal link between the repetitive work and the claimant's injury.

We note the term "repetitive" is not explicitly defined in section 42-1-172. However, the General Assembly indirectly defined the term in section 42-1-160, which is the more-general "injury by accident" statute. *See* S.C. Code Ann. § 42-1-160(F) (2015). Specifically, section 42-1-160(F) provides that any injury that occurs as a result of "a series of events in employment, of a similar or like nature, occurring regularly, continuously, or at frequent intervals in the course of such employment, over extended periods of time" is not compensable under the South Carolina Workers' Compensation Act except as provided for in section 42-1-172 (the repetitive trauma injury statute). Because the General Assembly removed those types of injuries from the general "injury by accident" statute and placed them in the purview of the repetitive trauma injury statute, we will utilize this definition of "repetitive" in applying the two-part analysis to the facts of this case.

## IV.

### A.

Looking first at whether Brooks's job was repetitive, we find the appellate panel's finding is not remotely supported by any evidence in the record. Even the ergonomics report makes no claim that Brooks's job was not repetitive, for the report was focused on the causation element based on asserted statistical probabilities.

As we alluded to above, Petitioner requires its switcher truck operators to move semitruck trailers and sea containers across a shipping yard. Petitioner's job description for a switcher truck operator acknowledges the clearly repetitive nature of the job: "Position may require up to 50–60 trailer moves a shift." In performing his job as a switcher truck operator, Brooks performed the same series of tasks at least once every twelve to fifteen minutes over the course of a twelve-hour shift.

The specifics of that series of tasks are undisputed. In particular, upon receiving notice that a particular semitruck trailer or sea container needed to be moved, Brooks would climb the steps to the switcher truck's rear platform, stoop into the cab via a relatively short rear door, drive the truck across the shipping yard, and reverse the truck towards the trailer. He would then use the switcher truck to hydraulically lift the trailer, stoop to exit the cab onto the rear platform, bend "[a]t least 90 degrees," and connect air and electrical hoses between the switcher truck and trailer. Brooks would then stoop to reenter the cab, pull the switcher truck and trailer forward four or five feet, stoop to exit the cab, climb down the stairs, close the trailer doors in the rear, climb the stairs again, stoop to reenter the cab, sit down, and drive the switcher truck across the shipping yard to the trailer's final destination. At that point, he would reverse the whole process: open the trailer doors, unhook the hose connections, lower the trailer, and drive away. Brooks would then proceed to the next trailer he was told to move. Repeating this series of tasks his entire twelve-hour shift would require Brooks to stoop in and out of the switcher truck's relatively short door approximately 225 to 300 times per shift.

From examining these undisputed facts, we see no suggestion Brooks's job did not involve a "series of events . . . occurring regularly, continuously, or at frequent intervals . . . over extended periods of time." S.C. Code Ann. § 42-1-160(F). Even the ergonomics report prepared by Petitioner's expert lists eighteen individual tasks performed by Brooks each time he switched a trailer, noting the "average length of time to complete the process is 15 min[utes]." Those eighteen tasks are repeated continually over a twelve-hour shift. The record establishes beyond any challenge

that Brooks's job involved repetitive tasks. We therefore find Brooks established the repetitive nature of his job—the first prong of the analysis under section 42-1-172—as a matter of law. *See Kinsey v. Champion Am. Serv. Ctr.*, 268 S.C. 177, 181, 232 S.E.2d 720, 722 (1977) ("Although the Commission is the fact[-]finding body, where the evidence gives rise to but one reasonable inference the question becomes one of law for the courts to decide."); *Hines v. Pac. Mills*, 214 S.C. 125, 131, 51 S.E.2d 383, 385 (1949) ("[I]f the evidence is all one way, . . . the issue becomes one of law for the Courts and not of fact for the Commission."). As a result, we hold the appellate panel's finding that Brooks's job was not repetitive is clearly erroneous in light of the substantial evidence in the record. *See Clemmons*, 420 S.C. at 287, 803 S.E.2d at 270.

**B.**

We note that while we agree with Petitioner and the appellate panel that a claimant must prove both that the nature of his employment was repetitive and the repetitive employment activities caused the injury in question, we also agree in part with the court of appeals: the first inquiry (whether the claimant's job is repetitive) will typically be subsumed under the second inquiry (whether the claimant's job caused the injury). It should be a rare case in which a claimant struggles to satisfy his burden to prove his job was repetitive; frankly, many jobs are.[4] Despite the appellate panel's statement to the contrary—faulting Brooks for not presenting expert ergonomic evidence in this case regarding the repetitive nature of his job—nothing in section 42-1-172 prohibits claimants from establishing the repetitious nature of their jobs

---

[4] In fact, the appellate courts in our state seem to have never wrestled with whether a job was repetitive. Rather, in discussing the facts of a repetitive trauma injury case, the appellate court either made an unsupported statement that the job at issue was repetitive without further discussion or, at best, discussed the matter in a cursory fashion. *See, e.g.*, *Pee v. AVM, Inc.*, 352 S.C. 167, 169, 573 S.E.2d 785, 786 (2002) ("Claimant worked for Employer in various capacities beginning in 1987. *Each of her jobs involved the repetitive use of her hands.* In the spring of 1995 . . . , she was diagnosed with moderately severe carpal tunnel syndrome . . . ." (emphasis added)); *Schurlknight v. City of N. Charleston*, 352 S.C. 175, 574 S.E.2d 194 (2002) (finding compensable as a repetitive trauma injury the hearing loss in a fireman caused by riding near the firetruck's siren for more than twenty-four years, but failing to discuss how often per day or week, or for how long (minute-wise), the fireman rode near the siren).

via their own lay testimony. Claimants merely need to show, through lay testimony or otherwise, that their jobs involve a "series of events . . . occurring regularly, continuously, or at frequent intervals . . . over extended periods of time." *See* S.C. Code Ann. § 42-1-160(F). The difficulty for the claimant, if there is any, should lie in whether the job was *sufficiently* repetitive to have caused the injury—the second prong of the analysis.

## V.

## A.

We now turn to the causation issue.[5] It is important to determine what evidence is necessary to establish the causation element in a section 42-1-172 claim. Section 42-1-172 requires causation of a repetitive trauma injury to be proven by "medical evidence," which is defined as "expert opinion or testimony *stated to a reasonable degree of medical certainty*, documents, records, or other material *that is offered by a licensed and qualified medical physician*." S.C. Code Ann. § 42-1-172(B)–(D) (emphasis added). In keeping with the statute, we have previously held that, when either an employee *or* an employer in a repetitive trauma injury case offers an opinion or testimony by a medical doctor, that evidence is inadmissible before the Commission—and, therefore, cannot be used to prove or disprove causation—unless it is stated to a reasonable degree of medical certainty. *See Michau v. S.C. Cntys. Workers Comp. Tr. ex rel. Georgetown Cnty.*, 396 S.C. 589, 595–96, 723 S.E.2d 805, 808 (2012) (holding that, because the employer's doctor's opinion was not stated to a reasonable degree of medical certainty, the opinion was inadmissible before the Commission and, consequently, could have no bearing on the causation analysis).

Similarly, non-medical opinions and testimony (which, for obvious reasons, can never be stated to a reasonable degree of medical certainty) are inadmissible on the issue of causation. *Cf. id.* Accordingly, here, the ergonomics report was patently inadmissible on the causation element. Notably, the appellate panel not only

---

[5] As an initial matter, Petitioner contends the appellate panel did not reach the issue of causation. However, a fair reading of its order demonstrates otherwise. For example, the appellate panel's order approvingly quotes the ergonomics report on the matter of causation, stating, "Adams concluded the observed tasks of a switcher operator 'do not meet any of the criteria . . . for elevated risks to the low back/lumbar spine.'" Moreover, the appellate panel rejected the medical causation evidence of Dr. Loudermilk based on the ergonomics report.

admitted the ergonomics report but also used it exclusively to support its finding that Brooks failed to establish a work-related repetitive trauma injury. Both of those decisions by the appellate panel amount to reversible errors of law.[6]

Because the General Assembly requires causation of a repetitive trauma injury to be established by expert medical testimony, the matter appears to be "one for experts or skilled witnesses alone and concerns a matter of science or specialized art or other matters of which a layman can have no knowledge." *See Herndon v. Morgan Mills, Inc.*, 246 S.C. 201, 216, 143 S.E.2d 376, 384 (1965); S.C. Code Ann. § 42-1-172(B), (D). In such cases, "the unanimous opinion of medical experts on [those] particular subjects may be conclusive, even if contradicted by lay witnesses." *Herndon*, 246 S.C. at 216, 143 S.E.2d at 384 (citations omitted). Here, the only medical evidence presented by the parties that could bear on causation is Dr. Loudermilk's uncontroverted opinion that Brooks's injury was caused by the repetitive activities he performed for Petitioner at work. As we explain below, we find that opinion controlling as to causation. *Id.*; S.C. Code Ann. § 42-1-172(B), (D).

While the appellate panel may refuse to accept even uncontroverted medical evidence, it must base its refusal on a valid reason supported by evidence in the record, and its failure to do so warrants reversal of a denial of compensation. 12 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 128.03[4] (2023) (collecting cases); *cf. Crane v. Raber's Disc. Tire Rack*, 429 S.C. 636, 646, 842 S.E.2d 349, 354 (2020). "*A fortiori*, when it affirmatively appears that the only medical testimony was disregarded for an invalid reason, the result will be reversed." *Larson's Workers' Compensation Law* § 128.03[4]; *see also Crawford W. Long Hosp. v. Mitchell*, 111 S.E.2d 120, 123 (Ga. Ct. App. 1959) ("It is . . . axiomatic that where there is any evidence to sustain the findings of fact by [the appellate panel], such findings and the award based thereon will not be disturbed by the courts. *Where, however, on appeal . . . it appears that the award denying compensation is*

---

[6] The appellate panel also faulted Brooks for "not present[ing] any expert ergonomic evidence that the job was sufficiently repetitive" to have caused his injuries. However, even if Brooks had presented his own ergonomics expert, under both *Michau* and the plain language of section 42-1-172(B) and (D), that expert's opinion could have had no bearing on causation, for it would not be "medical evidence." The appellate panel's attribution of fault toward Brooks for not bringing in his own ergonomics expert was arbitrary and capricious and amounted to an additional error of law.

*based on an erroneous conclusion drawn from the facts and the law, such award is properly reversed by the [appellate] court, and that court is authorized to enter proper final judgment based on the facts.*" (emphasis added) (cleaned up)).

Here, the appellate panel rejected Dr. Loudermilk's opinion—the only competent medical evidence bearing on causation—because he supposedly relied solely on Brooks's "self-serving statements" regarding his job duties. However, this finding is not only unsupported by the substantial evidence in the record, but expressly refuted by it. In fact, in the questionnaire submitted to and answered by Dr. Loudermilk, he specifically stated he had reviewed the ergonomics report—including its "unbiased" recitation of the series of tasks a switcher truck operator performs every fifteen minutes and conclusion that it posed "no elevated risks for the development of low back musculoskeletal disorders"—and indicated it did not alter his causation finding. Aside from the ergonomics report's rejection of a causal link between Brooks's repetitive work duties and injury, nothing in the record contradicts Dr. Loudermilk's conclusion that Brooks's injury was caused by his activities at work. In fact, during oral arguments, even Petitioner conceded the ergonomics report is wholly irrelevant and inadmissible on the issue of causation.

Brooks's diagnosis was based on objective medical evidence, specifically, an MRI showing lumbar disk degeneration and bulging, and both of Brooks's treating physicians—Drs. Loudermilk *and* Merriwether (who was hired by Petitioner)—seemingly agreed Brooks's injury was work-related in some fashion. *Cf., e.g., Crane*, 429 S.C. at 646, 842 S.E.2d at 354 (placing importance on objective medical evidence that negated the importance of the claimant's alleged lack of credibility regarding the nature and extent of his injury). We therefore conclude the appellate panel's rejection of the only competent evidence in the record bearing on causation was clearly erroneous in light of the substantial evidence in the record.

## B.

We find the ergonomics report had little relevance on the issue of the repetitive nature of the work and no relevance on the issue of causation. We reiterate our profound concern with the appellate panel's unquestioning reliance on the ergonomics report. A claimant should never be foreclosed from recovery for the sole reason that his or her injury is statistically unlikely. A causation inquiry is necessarily fact-intensive, based on a discrete set of circumstances under which a particular claimant must prove his or her injury is compensable. An ergonomics report, by definition, is the opposite of fact-intensive, as—in Adams's words—it merely identifies *possible* "ergonomic risk factors to which [an employee] *may* have

been exposed to while performing his job duties."  (Emphasis added).[7]

As the court of appeals correctly stated in this case, "Recovery under section 42-1-172 is not limited to work injuries that an ergonomics report deems statistically likely."  General application of a statistical analysis is not a valid basis on which causation decisions in a court of law or administrative agency should be made.  This is particularly true for repetitive trauma injury cases, for which the General Assembly has mandated medical evidence as the sole method to prove or disprove causation.

We recognize the Commission is the ultimate factfinder in workers' compensation cases.  As a result, when we reverse a decision by the Commission due to an error of law, we typically remand the matter so that it can reconsider the facts of the case through the proper legal framework.  Here, however, as the court of appeals correctly determined, the record establishes as a matter of law that Brooks sustained a compensable work-related injury.  The only issue left is the calculation of benefits.

## VI.

In sum, the court of appeals erred in rejecting the appellate panel's conclusion that section 42-1-172 requires a two-prong analysis, specifically, (1) whether a claimant's job activities are repetitive, as that term is defined in section 42-1-160(F); and (2) whether the claimant establishes by medical evidence that there is a causal link between the repetitive work and the alleged injury.  However, the court of appeals correctly reversed the appellate panel's decision due to a number of errors of law, most notably, its admission of and reliance on the ergonomics report.  The use of a generic statistical report to conclude a claimant's injury is unlikely and, therefore, not caused by his repetitive work activities is categorically rejected.  Accordingly, while we modify the decision of the court of appeals in part, we affirm in result and remand this matter to the appellate panel solely for calculation of the benefits to which Brooks is entitled.

---

[7] Indeed, here, Adams did not observe Brooks performing his job, nor did he even talk directly with Brooks regarding the specifics of how he performed his job-related tasks.  The ergonomics report contains obvious gaps rendering its reliability and conclusions questionable at best, including a failure to observe the physical requirements associated with moving sea containers (which, by all accounts, was far more physically demanding than moving semitruck trailers).

**AFFIRMED AS MODIFIED.**

**BEATTY, C.J., FEW, J., and Acting Justices John D. Geathers and Letitia H. Verdin, concur.**